[Cite as *State v. Ladson*, 2017-Ohio-7715.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 104642**

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## MARCUS LADSON

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-16-604466-A

**BEFORE:** S. Gallagher, J., Keough, A.J., and Stewart, J.

**RELEASED AND JOURNALIZED:** September 21, 2017

**ATTORNEY FOR APPELLANT**

Kevin M. Cafferkey
2100 Illuminating Building
55 Public Square
Cleveland, Ohio   44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
By: Eben McNair
        Zachary M. Humphrey
        Andrew J. Santoli
Assistant Prosecuting Attorneys
Justice Center - 9th Floor
1200 Ontario Street
Cleveland, Ohio   44113

SEAN C. GALLAGHER, J.:

{¶1}   Marcus Ladson was found guilty, after a lengthy jury trial, of theft of a firearm and of crimes associated with several shootings that occurred over the course of a month, one of which resulted in the murder of Curtis Avent III.  Ladson was ultimately convicted of murder, several counts of improperly discharging a firearm into habitation, felonious assault for shooting indiscriminately into a bar and wounding two patrons, participating in a criminal gang, and having weapons while under disability — along with attendant firearm, gang, and drive-by specifications.  At the sentencing hearing, the trial court imposed a 127-year aggregate sentence, comprised of all the maximum sentences and enhancements being served consecutively to each other and to the indefinite sentence of 15 years to life.[1]   In addition, the trial court ordered the aggregate sentence in this case to be consecutively served to a 16.5-year sentence Ladson was already serving in Cuyahoga C.P. No. CR-15-599880-A.  *State v. Ladson*, 8th Dist. Cuyahoga No. 104091, 2016-Ohio-7781, ¶ 1.  We affirm.

---

[1]Ladson mentioned that his aggregate sentence is 124 years before being eligible for release, but the chart provided in Ladson's appellate brief indicates a 118-year term.  The final sentencing entry corresponds with Ladson's chart; however, the transcript reflects a 127-year aggregate sentence being imposed before Ladson is eligible for release.  Evidently, the trial court omitted three specifications, from the final sentencing entry, attached to Counts 1, 16, and 20, that added 9 years to the aggregate term.  Neither of the parties were bothered by this discrepancy, so neither are we; given the practical difference between a 118- and 127-year term before parole eligibility, it is not hard to understand the indifference.   If the final sentencing entry differs from the sentence pronounced at the sentencing hearing, we are confident the parties can correct the record to reflect that which occurred, if necessary.

**{¶2}** In January 2015, a third party reported her 9 mm handgun stolen. The night before, her significant other borrowed the car, seemingly unaware the firearm had been left in the back. In the early morning hours, Ladson was driven from a bar in the car, and the two stopped at a convenience store. Ladson was left unattended in the running vehicle and was the only other person in the vehicle the night the handgun disappeared, although there was a claim that some other individuals milled about the car in the convenience store parking lot. *Ladson* at ¶ 2. The theft was discovered the next day. The stolen silver and black 9 mm handgun is a Smith & Wesson model SD9VE.

**{¶3}** Late in March 2015, Ladson was arrested for shooting into an apartment. The stolen 9 mm handgun and a smart phone in Ladson's possession were confiscated, and Ladson tested positive for gunshot residue. *Id.* Police experts were able to link the spent 9 mm casings found at the scene to the stolen firearm. *Ladson* at ¶ 3. This also created the foundation to connect the weapon to a string of crimes occurring between February 21 and March 15, 2015. Officers searched Ladson's phone for additional incriminating evidence.

**{¶4}** In early March 2015, Ladson called 911, providing his telephone number, which was then linked to Ladson's smart phone recovered by police officers upon his arrest, demonstrating that the phone was indeed Ladson's. Ladson had called seeking police assistance when his girlfriend retrieved property from his house, located at 5719 Lansing. Ladson's girlfriend also called 911 claiming that Ladson forced her from the property with a "silver and black" handgun, which resembled the stolen 9 mm. She later

claimed, in a statement contained in the responding officer's report, that Ladson owned the "silver and black" handgun but did not use or brandish the weapon at the time she called for assistance — although the officer noted that Ladson may have had the weapon in his pocket at the time. The hearsay in the police report never made it to the jury. Ladson's girlfriend did not testify at trial, but the recording of her 911 call was played for the jury.

{¶5} The state's experts were able to extract the history of internet searches initiated on Ladson's smart phone. Ladson had searched for information pertaining to, and ammunition and extended-capacity magazines for, a Smith & Wesson SD9VE handgun — the same model as the 9 mm handgun stolen in January. The earliest such search was conducted four days after the theft was reported, and the latest internet search associated with those items occurred near the end of February, in the midst of the shooting spree.

{¶6} In the interim, a separate shooting that killed Ladson's cousin had occurred at a local barbershop. The accused shooter, Douglas Shine, was a member of the Heartless Felons gang. Ladson's cousin was not affiliated with any criminal organization and appears to have been in the wrong place at the wrong time. The other victims at the barbershop were affiliated with a rival gang. Of note relating to the barbershop events, Ladson had bookmarked a February 24 story about the bomb squad being dispatched to Shine's mother's house on his phone's internet browser. The state theorized that Ladson was retaliating for the barbershop shooting because all of the drive-by shootings targeted Shine's family members or were an attempt to target those that orchestrated the barbershop

shooting. The defense claimed that the rival gang was targeting Shine's family in retaliation.

{¶7} There were four drive-by shootings in all, not including the murder, three of which directly involved Shine's family members. The shooting at Shine's mother's home occurred on February 24, the same day the bookmarked article found on Ladson's phone was published. The fourth shooting occurred at a bar, and three individuals were wounded, although only two testified at trial. This led to the charges for the third victim to be dismissed under Crim.R. 29. Testimony from bystanders at the bar indicated that a car pulled up before the shooter began firing, for the purposes of the drive-by shooting specifications. Police testified that Ladson's motive for shooting into the bar stemmed from information placing the orchestrator of the barbershop shooting at the bar.

{¶8} As it relates to the drive-by shootings and the separate murder of Avent, the state also presented evidence that Ladson's phone was in the vicinity of one of the shootings and the murder, based on cell-phone mapping techniques, and spent shell casings from the stolen 9 mm handgun were recovered from every scene. In addition to the above, the state presented evidence that Ladson had called someone in the area of the Avent murder immediately before the murder occurred, telling that person he was in the area and wanted to meet up. The call corresponded to the cell tower mapping evidence that placed Ladson in the vicinity.

{¶9} There was video surveillance of the Avent murder, but the offender's car was unidentifiable, and the eyewitness, self-described as being intoxicated to the point of

"blacking out," was unable to provide any information. The video surveillance depicted two individuals exiting a car, one of whom shot Avent at close range. Before being murdered, Avent had been assaulting the eyewitness, Avent's girlfriend. Avent was not affiliated with any gang and was not related to Shine.

{¶10} The charge of participating in a criminal gang and the gang-related specifications were tried to the bench. A detective specializing in gang activity testified that Ladson had several tattoos indicative of membership in the Heartless Felons criminal organization. In several photographs recovered from Ladson's phone, Ladson was also depicted posing with known members of the gang and flashing hand signs associated with gang affiliation.

{¶11} Because of the series of parallel inferences derived from the submitted evidence, Ladson was convicted of the murder of Avent, three counts of improperly discharging a firearm into a habitation, two counts of felonious assault, six counts of having a weapon while under disability, participating in a criminal gang, and theft — all with associated firearm, gang, and drive-by specifications. This timely appeal followed in which Ladson advanced 16 assignments of error, several of which are related.

{¶12} The most significant assignment of error focuses on Ladson's claim that the evidence was insufficient to substantiate each individual conviction. A claim of insufficient evidence raises the question whether the evidence is legally sufficient to support the verdict as a matter of law. *Id.* In reviewing a sufficiency challenge, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. Although Ladson also referenced the manifest weight of the evidence standard, his claims all focus on the sufficiency of the evidence and present no independent argument challenging the weight of the evidence. A claim that a jury verdict is against the manifest weight of the evidence involves a separate and distinct test that is much broader than the test for sufficiency. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 193. Accordingly, our focus is limited to the sufficiency of the evidence.

{¶13} The crux of Ladson's argument is that the state generally failed to present any direct evidence demonstrating that Ladson committed the crimes. This ignores the general rule in Ohio that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value." *Jenks* at paragraph one of the syllabus. The lack of direct evidence is not dispositive.

{¶14} The state presented evidence that Ladson was the only person with the opportunity to steal the 9 mm handgun, and immediately after the weapon was reported stolen, Ladson searched for information and equipment related to that specific model. Thus, a reasonable trier of fact could have inferred that Ladson stole and maintained possession of the 9 mm handgun.

{¶15} Ladson's phone contained evidence linking Ladson to the stolen firearm during the time in which the shootings took place, placing Ladson at the scene of at least

two of the shootings, and demonstrating that Ladson was a member of the criminal gang known as the Heartless Felons. Yet another witness claimed that Ladson was in possession of a firearm that resembled the stolen firearm between the date of the theft and the date the firearm was recovered in Ladson's possession, demonstrating that Ladson had continuous possession of the weapon. Finally, the 9 mm handgun Ladson stole, possessed, and was arrested with was used in several shootings. In light of those facts, a reasonable trier of fact could infer that Ladson was the shooter, and in short, the state presented circumstantial evidence of Ladson's guilt when all the evidence is considered as a whole. The arguments advanced in this appeal regarding the sufficiency of the evidence cannot be deemed reversible error. App.R. 16(A)(7).

{¶16} As it relates to the more specific arguments advanced on the sufficiency issue, Ladson claims there was no underlying felony to support the felony murder charge under R.C. 2903.02(B), which provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence * * *." Ladson claims that the underlying felonious assault, for which the jury found Ladson guilty, was not supported by sufficient evidence because the only assault that occurred was that of Avent assaulting his girlfriend. This ignores the assault that Ladson perpetrated on Avent by shooting him. A felonious assault of a person that leads to the victim's death can be the basis of a felony murder charge. *State v. Miller*, 96 Ohio St.3d 384, 2002-Ohio-4931, 775 N.E.2d 498, syllabus.

{¶17} Ladson also argues that there is no evidence supporting the conviction for participating in a criminal gang because the state failed to causally connect the charges in this case with any involvement with the Heartless Felons. R.C. 2923.42(A) provides that "[n]o person who actively participates in a criminal gang * * * shall purposely promote, further, or assist *any* criminal conduct * * * or shall purposely commit or engage in any act that constitutes criminal conduct." (Emphasis added.) Criminal conduct is defined as the commission of two or more felony acts or offenses of violence. R.C. 2923.41(B)-(C). There is no statutory requirement that the criminal conduct underlying the charges at hand must be causally connected to gang activity to support the charge of participating in a criminal gang, only that the offender is a member of a criminal gang and commits two or more felony offenses or offenses of violence. *State v. Taylor*, 9th Dist. Lorain Nos. 10CA009922 and 10CA009915, 2012-Ohio-1263, ¶ 90.

{¶18} The state presented sufficient evidence that Ladson was a member of the Heartless Felons criminal gang through the testimony of the officer specializing in gang activity, who also testified that Ladson had been convicted of numerous gang-related crimes in the past. Ladson was depicted in several photographs flashing hand signs associated with the gang and posing with several known members. Further, Ladson had tattoos indicative of his membership in the criminal enterprise. Coupled with the findings of guilt for multiple felony offenses, the state met its burden. *See, e.g., State v. King*, 8th Dist. Cuyahoga No. 98234, 2013-Ohio-574, ¶ 20 (logical inferences derived from the state's evidence that the defendant posed with known gang members who held

gang-affiliated items demonstrated participation in a criminal gang). Ladson's arguments pertaining to the sufficiency of the evidence are overruled.

**{¶19}** As it relates to the evidence in support of the conviction, Ladson also challenges the admission of several key pieces of information: (1) the security footage depicting the murder of Avent; (2) the evidence from the detective specializing in criminal gang activity that was heard by the jury; (3) the recordings of Ladson's and his girlfriend's 911 calls; and (4) the expert testimony linking the shell casings to the stolen 9 mm handgun and providing ballistic reports. In each of the assigned errors, Ladson presents a summary conclusion that the evidence was inadmissible. App.R. 16(A)(7) requires the appellant to present the arguments in support of reversal and any supporting authority. It is not this court's responsibility to find the relevant case law in support of a party's argument. *Citta-Pietrolungo v. Pietrolungo*, 8th Dist. Cuyahoga No. 85536, 2005-Ohio-4814, ¶ 35, citing *Cardone v. Cardone*, 9th Dist. Summit Nos. 18349 and 18673, 1998 Ohio App. LEXIS 2028, 22 (May 6, 1998).

**{¶20}** We decline to address the summary conclusions presented as arguments. App.R. 12(A)(2). "A trial court has broad discretion concerning the admission of evidence; in the absence of an abuse of discretion that materially prejudices a defendant, a reviewing court generally will not reverse an evidentiary ruling." *State v. Serrano*, 2016-Ohio-4691, 69 N.E.3d 87, ¶ 24 (8th Dist.), citing *State v. Humberto*, 196 Ohio App.3d 230, 2011-Ohio-3080, 963 N.E.2d 162, ¶ 25 (10th Dist.), and *State v. Issa*, 93 Ohio St.3d 49, 64, 2001-Ohio-1290, 752 N.E.2d 904; *State v. Montgomery*, 148 Ohio

St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶ 137. Ladson has not demonstrated that the trial court abused its discretion by admitting the challenged evidence.

{¶21} Further, it is worth noting that Ladson benefitted from the introduction of the video footage of the Avent murder because no one could identify anything from the video and the sole witness to the murder was discredited by what appeared in the footage. The defense strategy was in part to create reasonable doubt by implicating a rival gang, a theory that required the gang detective's testimony. Ladson has also not demonstrated that the Confrontation Clause was violated by the admission of the recorded 911 call from his girlfriend who did not testify at the trial. The Confrontation Clause is not implicated solely because a witness is not present to testify. *State v. Herring*, 8th Dist. Cuyahoga No. 104441, 2017-Ohio-743, ¶ 14, citing *Montgomery* at ¶ 88. We overrule Ladson's assignments of error challenging the sufficiency and admissibility of the evidence.

{¶22} Ladson next argues that the trial court erred by not dismissing the theft-related charges pertaining to the stolen 9 mm firearm because in Cuyahoga C.P. No. CR-15-599880, Ladson was convicted of receiving stolen property for having possession of the same firearm. Ladson, in his oral motion to dismiss, claimed the state cannot separate the receiving stolen property charge from the underlying theft because the conduct underlying the offenses was the same. Tr. 7:2-5 (upon oral motion and without citation to any case authority, Ladson's counsel claimed that the state does not "get a second chance to try my client for [theft-related charges pertaining to the stolen 9 mm firearm because] that's same conduct and we feel that jeopardy attached."). The trial

court disagreed and held that the underlying offenses were committed with separate conduct. Tr. 12:20-23 ("Based on the fact that there are different charges and different dates and different circumstances, the Court is going to deny your motion.").

**{¶23}** Ladson's entire argument on appeal is that "[t]he Double Jeopardy Clause prohibits a successive prosecution in this case because they are an allied offense of similar import to the previous receiving stolen property and Having Weapons Under Disability in case 599880." The "allied offense" argument inherently relies on R.C. 2941.25, which considers the two crimes to be allied offenses of similar import, in part, if the conduct underlying the offenses was the same. *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, paragraph three of syllabus. The state responded by discussing *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932), which in part sets forth a review of the elements of the crimes when the crimes are deemed to have been committed with the same conduct. *Id.* at 303-304 (two offenses were committed separately and therefore multiple convictions were valid, but because two other crimes were committed with the same conduct and each offense required proof of a different element, then multiple prosecutions were not prohibited). In light of the trial court's decision and, in addition, given that Ladson has never discussed the elements of the offenses under *Blockburger*, the state's discussion is unhelpful. *Id.* Nevertheless, the sole argument presented for our review is whether the allied-offense analysis under Ohio law precludes successive prosecutions. We conclude that it does not.

**{¶24}** R.C. 2941.25 codifies the double-jeopardy protections established by the Ohio Constitution. *In re A.G.*, 148 Ohio St.3d 118, 2016-Ohio-3306, 69 N.E.3d 646, ¶ 11. However, R.C. 2941.25 expressly applies to multiple offenses within a single indictment or information. The allied-offense statute does not apply to successive indictments. *State v. Workman*, 4th Dist. Athens No. 14CA25, 2015-Ohio-4483, ¶ 13; *State v. Zima*, 102 Ohio St.3d 61, 2004-Ohio-1807, 806 N.E.2d 542, ¶ 40, fn. 3; *see, e.g., State v. Ikner*, 44 Ohio St.2d 132, 133, 339 N.E.2d 633 (1975). Whether the two crimes are allied is irrelevant with respect to successive indictments. Ladson's argument to the contrary is overruled.

**{¶25}** Ladson also challenges the state's decision to join the separate crimes into one indictment for the purposes of a single trial. Crim.R. 13 provides that a trial court may order two or more indictments to be tried together "if the offenses or the defendants could have been joined in a single indictment or information" under Crim.R. 8(A). "'[J]oinder and the avoidance of multiple trials is favored for many reasons, among which are conserving time and expense, diminishing the inconvenience to witnesses and minimizing the possibility of incongruous results in successive trials before different juries.'" *State v. Anderson*, 8th Dist. Cuyahoga No. 104460, 2017-Ohio-931, ¶ 23, quoting *State v. Torres*, 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981). *See also State v. Schiebel*, 55 Ohio St.3d 71, 86-87, 564 N.E.2d 54 (1990); *State v. Schaim*, 65 Ohio St.3d 51, 58, 1992-Ohio-31, 600 N.E.2d 661.

**{¶26}** Generally, joinder is disfavored where the jury could potentially confuse the issues and the facts essential to the elements of the distinct crimes. "To succeed on a motion to sever, a defendant 'must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial.'" *State v. Lytle*, 10th Dist. Franklin Nos. 15AP-748 and 15AP-754, 2016-Ohio-3532, ¶ 64, quoting *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990); *Torres* at syllabus.

> **{¶27}** Ladson's sole argument, on this point, is that
>
> the only thing that links all of the offenses in the Indictment is the firearm that was involved in all of the offenses. Each act was committed on a different day and has a separate and distant motives [sic]. Just because Mr. Ladson was found in possession of a firearm was NOT sufficient to prove that he committed every criminal act that the firearm had ever been used in. The charges in this case were improperly bootstrapped together, and then bootstrapped to prejudicial gang related charges and specifications that were introduced to the jury to obtain an improper guilty verdict.

Ladson has not met his burden to demonstrate that joinder prejudiced his right to a fair trial. The state used the same evidence for all of the crimes — notably the expert testimony demonstrating that the shell casings were fired from the stolen 9 mm handgun that Ladson possessed and the cell-phone mapping evidence. Joining all the incidents into one trial conserved time and expenses, diminished the inconvenience to the same witnesses who would have had to testify at each individual trial, and minimized the possibility of incongruous results in successive trials before different juries analyzing the same evidence.

**{¶28}** Finally, with respect to all things trial related, Ladson claims his trial attorney was ineffective for (1) failing to review all discovery material with Ladson before trial; (2) for failing to remove a juror who fell asleep during trial, and (3) for opening the door to the gang-related evidence for the jury portion of the trial. We find no merit to any of Ladson's claims.

**{¶29}** In order to substantiate a claim of ineffective assistance of counsel, the appellant must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 98, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Judicial scrutiny of defense counsel's performance must be highly deferential. *Strickland* at 689. In Ohio, there is a presumption that a properly licensed attorney is competent. *State v. Calhoun*, 86 Ohio St.3d 279, 289, 1999-Ohio-102, 714 N.E.2d 905. The defendant has the burden of proving his counsel rendered ineffective assistance. *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 223.

**{¶30}** Retaining the juror was not error. Generally, it is within the trial court's discretion whether a juror's misconduct necessitates removal. *State v. Sanders*, 92 Ohio St.3d 245, 253, 2001-Ohio-189, 750 N.E.2d 90, quoting *United States v. Freitag*, 230 F.3d 1019, 1023 (7th Cir.2000). In this case, no one observed the juror in question sleeping at any point during the trial — although after the fact, the prosecutor mentioned that the juror's posture could be indicative of slumber. Another juror informed the trial court's

bailiff that she supposedly "heard" the juror sleeping. Although Ladson paints the picture that this juror continually fell asleep, there was only one discussion held on the record regarding such an instance and the claim was never substantiated. Instead, the trial court devoted considerable time to the matter and allowed both parties to question the juror, who incidentally stated that she had not been sleeping and heard all the testimony. *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 187 (nothing in the record indicated that the juror actually missed critical evidence, and therefore there was no plain error). The trial court then allowed both sides the opportunity to dismiss the juror after considering her credibility. Neither took the trial court up on the offer. Even if we gave Ladson every benefit of the doubt on this issue, he has failed to demonstrate any prejudice that resulted from the juror's actions, based on the record presented. *Id.*

{¶31} As it relates to the failure to review discovery, Ladson has not identified any prejudice that directly stemmed from the failure to review any particular evidence. In one instance during trial, trial counsel had not been provided the police report that included statements from Ladson's girlfriend, the witness who claimed to have seen Ladson in possession of a "silver and black" handgun. Ladson's trial counsel maintained that the state had not provided the report, which could have contradicted the 911 tape, although in the report, the witness claimed that Ladson possessed the gun but was not brandishing it in her presence. Defense counsel maintained that the report was not included in the state's discovery. Tr. 1220. The state countered that the recorded 911 conversation and subsequent dispatch audio was provided in discovery, and those contained the information

in the police report that had been belatedly disclosed. Tr. 1228. The state never argued that defense counsel was provided the report with the rest of the discovery.

{¶32} In the other incident, defense counsel could not locate a particular police report being discussed in one police officer's trial testimony. Tr. 1057. It turned out defense counsel's confusion was well founded — the state had "mislabeled" the report in its discovery responses. Tr. 1108. That report was nonetheless available for the defense during the particular officer's testimony, and Ladson cannot demonstrate that he was prejudiced by the minor oversight. Further, Ladson has not specifically identified, and we are unable to find, any other instances in which trial counsel failed to review discovery materials, and thus there is no ineffective assistance claim based on the record provided. App.R. 16(A)(7).

{¶33} Ladson also claims his trial counsel wrongfully opened the door to the jury hearing the detective's testimony in reference to the evidence of criminal gangs. Ladson claims there was no trial strategy supporting the need for the evidence, but the defense's closing remarks relied on much of the testimony to establish the defense's primary theory — that a rival gang was retaliating against Shine based on his involvement in the barbershop shooting. The defense attempted to cast doubt on Ladson's involvement by implicating the rival gang whose members were also victims of the barbershop shooting. The detective's testimony was a necessary foundation for that theory, and because Ladson has cast his entire ineffective-assistance argument based on the alleged lack of trial

strategy for introducing the gang evidence to the jury, we must overrule it. *See State v. Webster*, 8th Dist. Cuyahoga No. 102833, 2016-Ohio-2624, ¶ 121.

**{¶34}** Finally, Ladson challenges the sentences imposed on the specifications as being allied offenses of similar import with the underlying charges and also claims it is inequitable to impose consecutive service of all the maximum sentences. Neither argument has merit.

**{¶35}** Ladson likened the imposition of the sentences on the gang specifications and the participating in a criminal gang offense to imposing sentences on having a weapon while under disability and a firearm specification. The analogy is appropriate; however, the outcome is not in his favor. In Ohio, courts cannot apply the allied-offense analysis to specifications because the sentence imposed for a specification is a sentencing enhancement. *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 219 (R.C. 2941.25 and the attendant allied-offense analysis do not apply to sentencing enhancements such as firearm specifications). R.C. 2941.25 only applies to the merger of "two or more allied offenses." There is no merit to the claim that the sentences imposed on the specifications must merge with any of the counts.

**{¶36}** We also find no error with respect to the consecutive sentences as argued; there is no requirement in Ohio that consecutive sentences must be "equitable" or that the trial court must provide reasons in support of the findings. The "equities" of imposing consecutive sentences statutorily rests with the trial court's ability to make the necessary findings under R.C. 2929.14(C)(4) before imposing the terms, and it is well settled that a

trial court need not provide reasons in support of its consecutive-sentence findings. *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37.

**{¶37}** Having overruled all of Ladson's assigned errors, we affirm his convictions.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

SEAN C. GALLAGHER, JUDGE

KATHLEEN ANN KEOUGH, A.J., CONCURS;
MELODY J. STEWART, J., CONCURS IN JUDGMENT ONLY WITH SEPARATE OPINION

MELODY J. STEWART, J., CONCURRING IN JUDGMENT ONLY:

**{¶38}** I concur with the judgment reached by the majority, but write separately for two reasons: first, I am troubled by the stacking of inferences to prove that Ladson stole the firearm and committed murder; second, that a double jeopardy analysis should apply to Ladson's argument that the court erred by denying his motion to dismiss the grand theft count.

{¶39} The state can rely on circumstantial evidence to prove an essential element of a crime. *State v. Kulig*, 37 Ohio St.2d 157, 159, 309 N.E.2d 897 (1974), syllabus. At bottom, circumstantial evidence is evidence that requires an inference to connect it to a conclusion of fact. *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. An inference can only be derived from an established fact; "[a]n inference of fact cannot be predicated upon another inference, but must be predicated upon a fact supported by evidence." *Sobolovitz v. Lubric Oil Co.*, 107 Ohio St. 204, 205, 140 N.E. 634 (1923), paragraph two of the syllabus.

{¶40} The only "fact" established by direct evidence was that at the time of his arrest (some ten days after the murder), Ladson was in possession of a gun that a forensic analysis determined to be the weapon that fired two shell casings found at the murder scene. All other "facts" had to be inferred: the jury had to infer that Ladson stole the firearm; that he was at the scene of the murder; that he was in possession of the firearm at the time of the murder; and that he used the firearm to kill the victim. The only other evidence offered to prove that Ladson shot and killed the victim was that Ladson's cell phone had been in an approximate three- to four-square mile area that encompassed the murder scene. But the area was also one that encompassed Ladson's home, and the homes of his girlfriend and another female friend, at least one of whom Ladson was trying to visit in the early morning hours: calls were verified using mapping of Ladson's cell phone.

**{¶41}** Proof that Ladson committed the murder, however, was tenuous. The jury had to essentially infer Ladson's guilt based on his being in possession of the firearm before the murder (the charge of theft of the gun), and the fact that he was in possession of the firearm when he was arrested more than a week after the murder. This left an inferential gap. The state tried to fill that gap with motive — that Ladson had a motive to kill as revenge for his cousin being a victim of the barbershop shootings. But there was no evidence that tied the murder victim to any aspect of a revenge killing. Even more troubling was the fact that there were witnesses to the murder, or people on the scene when the murder occurred, who did not seem to be alarmed or even bothered by the early morning shooting — including the victim's girlfriend.

**{¶42}** These observations notwithstanding, I cannot say, however, that the inferences available to the jury were so unreasonable that no rational trier of fact could have made them. I thus agree that for purposes of this appeal, the state presented sufficient evidence for the murder conviction.

**{¶43}** Regarding Ladson's fourth assignment of error: that the court erred by refusing to dismiss Count 7, which charged Ladson with grand theft relating to the firearm he possessed and that was stolen from the car, Ladson based his motion to dismiss Count 7 on double jeopardy grounds, arguing that he was being subjected to successive prosecutions. The lead opinion latches on to language that Ladson used stating that "[t]he Double Jeopardy Clause prohibits a successive prosecution in this case because they are an allied offense of similar import to the previous receiving stolen property and Having

Weapons Under Disability in case 599880." The use of the phrase "allied offenses of similar import" was meant to indicate Ladson's belief that grand theft of the gun and receiving stolen property (the gun) were in essence the same offense for purposes of successive prosecution. The state obviously understood Ladson's meaning — its argument, too, focuses solely on double jeopardy.

{¶44} Nevertheless, Ladson cannot prevail under a proper double jeopardy analysis. One aspect of double jeopardy is that it precludes successive prosecutions for greater and lesser-included offenses. *Payne v. Virginia*, 468 U.S. 1062, 104 S.Ct. 3573, 82 L.Ed.2d 801 (1984). Ohio courts use the test set forth in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932), to determine whether the same act or transaction constitutes a violation of two distinct statutory provisions: "'whether each offense contains an element not contained in the other; if not, they are the "same offence" and double jeopardy bars additional punishment and successive prosecution.'" *State v. Mutter*, Slip Opinion No. 2017-Ohio-2928, ¶ 17, quoting *United States v. Dixon*, 509 U.S. 688, 696, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993).

{¶45} "[R]eceiving stolen property is technically not a lesser included offense of theft * * *." *State v. Yarbrough*, 104 Ohio St.3d 1, 2004-Ohio-6087, 817 N.E.2d 845, ¶ 99. *See also State v. Workman*, 4th Dist. Athens No. 14CA25, 2015-Ohio-4483, ¶ 28 ("because receiving stolen property is not a lesser included offense of either theft or unauthorized use, the Double Jeopardy Clause does not bar a successive prosecution for

receiving stolen property"). So Ladson's successive prosecution for theft was not barred by double jeopardy.

{¶46} This raises an anomaly, however: there is no doubt that had the state brought both the grand theft and receiving stolen property counts in a single prosecution, the receiving stolen property count would merge for sentencing with the theft count under R.C. 2941.25(A). *See* Committee Comment to R.C. 2941.25 (using crimes of theft and receiving stolen property as examples of the kind of "shotgun" convictions barred by the statute). Double jeopardy claims relating to the protection against successive prosecutions are controlled by the *Blockburger* test, not the allied offenses statute. *See, e.g., State v. Zima*, 102 Ohio St.3d 61, 2004-Ohio-1807, 806 N.E.2d 542, ¶ 40, fn. 3 ("since the present case involves only the issue of successive prosecutions, it is not controlled by R.C. 2941.25"); *State v. Lamp*, 9th Dist. Summit No. 26602, 2013-Ohio-1219, ¶ 7. By charging the theft and receiving stolen property counts in separate cases, the state made a legal, but perhaps unfair, end-run around the allied offenses statute. This resulted in Ladson receiving an 18-month sentence for receiving stolen property (the gun) in CR-15-599880, and being sentenced to three years in prison on the theft count in this case for stealing the same gun.